IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| KOFI JAMISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | 12 C 4415 |
| | ) | |
| FIRST CREDIT SERVICES, INC. d.b.a. | ) | Judge Virginia M. Kendall |
| ACCOUNTS RECEIVBABLE | ) | |
| TECHNOLOGIES, and AMERICAN HONDA | ) | |
| FINANCE CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Kofi Jamison ("Jamison") filed a putative class action complaint against Defendants First Credit Services, Inc. ("FCS") and American Honda Finance Corporation ("Honda") alleging violations of the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227. Jamison now moves this Court to certify this case as a class action pursuant to Federal Rule of Civil Procedure 23. The Defendants object to Jamison's motion for class certification and have also separately moved this Court to stay this case while the Federal Communications Commission interprets certain issues involving the TCPA. For the reasons set forth below, all of the motions are denied.

## BACKGROUND[1]

This case is the sequel to an earlier filed putative class action entitled *Pesce v. First Credit Services, Inc.,* No. 11 C 1379 (N.D.Ill. 2011). That case was litigated before the

---

[1] The facts described in the background section are taken from the parties' briefs, the exhibits attached to their briefs, the declaration submitted by Melissa Metcalf as well as certain, non-material facts that were judicially noticed.

Honorable Robert W. Gettleman. The prosecuting attorneys and Defendant FCS were part of the original; however, this case contains a new lead plaintiff and an expanded cast of defendants. Class certification was initially granted in *Pesce*; however, upon a subsequent motion by FCS, Judge Gettleman decertified the class because: (1) the defined class was too broad because it included class members who consented to receiving calls from FCS on their wireless phones because they had provided their cellphone numbers to Honda as contact numbers; and (2) the plaintiff was not a proper class representative because his individual issues predominated over the class-wide issues. *Pesce* at Doc. 126. During discovery in that case, the Plaintiff identified Jamison as a potential class member. Jamison sought leave to intervene in *Pesce* to be named the new class representative. *Id.* Judge Gettleman denied that motion because he decertified the class. After the plaintiff in that case settled, Jamison filed the instant case in which he modifies the definition of the putative class in an attempt to avoid the effect of Judge Gettleman's ruling.

Jamison is a convicted felon. He pled guilty in 2008 to access device fraud. Specifically, he was part of a scheme to steal credit card and debit card information, transfer that information to other cards, use those other cards to buy iPods and other goods and then sell those goods on the street. Jamison filed this lawsuit a few weeks after his probation ended in 2012.

Honda is an entity that provides financing to individuals seeking to purchase Honda automobiles. A purchaser of an automobile generally has the option of paying the full purchase price in cash at the time of purchase or he can finance his purchase by obtaining a loan and repaying that loan in monthly installments. If a purchaser chooses to finance his purchase, he generally obtains the loan through a financing company that is a subsidiary of the automobile manufacturer. In this case, Honda Finance is a subsidiary of American Honda Motor Co., Inc., the sole authorized distributor of Honda motor vehicles and other Honda products in the United

States.  *See* About Honda Financial Services and American Honda Finance Corporation, http://www.hondafinancialservices.com/help/about-us.  If, after purchasing an automobile, a borrower fails to make payments, Honda may be required to retain third-party debt collectors to attempt to collect the debt.  One of these third-party collectors is FCS.

Jamison did not finance the purchase of an automobile through Honda and was not indebted to Honda.  However, Jamison's sister was indebted to Honda and had failed to pay the monthly installments on her loan.  As a result, Honda referred the collection of her account to FCS.  FCS ran a "skip-trace" on Jamison's sister, which yielded the number for Jamison's cellular telephone.  FCS then allegedly called Jamison's cellphone multiple times between August and September 2010 using an automated dialing system in an attempt to collect the debt.  Jamison never consented to Honda or FCS calling him on his cellphone.  There is a question as to whether Jamison is the actual subscriber of the cellphone FCS allegedly called.  The account for the wireless phone number that was allegedly called is in Jamison's mother's name, not Jamison's.  The bills are sent to Jamison's mother's house.  Jamison also conceded during his deposition that AT&T would look to his mother rather than to him for payment.  However, Jamison also testified that he pays the bill.

FCS allegedly obtained the wireless numbers of many Honda customers via running "skip-traces."  It then used its automated dialing system to call 2,887 cellphone numbers that were obtained by skip-trace methods.  However, there is an open question as to whether these individuals provided their consent to Honda to call their wireless numbers.  Honda routinely obtains phone numbers from its customers.  Its credit application has included a space for cellphone numbers since 2008, and even before then it was common for customers to provide cellphone numbers.  However, when Honda gave information about debtors to FCS so that FCS

could attempt to collect those debts, Honda provided few, if any, wireless numbers even when Honda had those numbers somewhere in its system. As a result many of the numbers obtained by FCS through skip-tracing were previously provided to Honda.

## THE TCPA

Congress enacted the TCPA on December 20, 1991 to address telephone marketing calls and certain telemarketing practices that Congress found to be an invasion of consumer privacy. As is relevant here, the TCPA regulates the use of automated telephone equipment. Specifically, section 227(b)(1)(A) prohibits the use of any automatic telephone dialing system to call any telephone number assigned to a cellular telephone service absent an emergency purpose or the "prior express consent of the called party." Congress believed that automated or prerecorded telephone calls were a greater nuisance and invasion of privacy than live solicitation calls, that such calls were costly and that such calls were inconvenient. *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02-278, 23 F.C.C. Rcd 559, 559-60, ¶ 2 (2008) ("2008 TCPA Order").

The Federal Communications Commission ("FCC") is the agency vested with authority to issue regulations implementing the TCPA. On July 3, 2003, the FCC found that a predictive dialer falls within the meaning and statutory definition of "automatic telephone dialing equipment" and the intent of Congress. *See In the Matter of the Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02-278, 18 FCC Rcd 14014 (2003) ("2003 TCPA Order"). On July 4, 2008, the FCC clarified the existing rules under the TCPA. In particular, it affirmed that it is unlawful to make a call using an automatic telephone dialing system or an artificial or prerecorded message to a wireless telephone number for purposes of collecting a debt unless the call is made with the "prior express consent" of the

4

called party.  *See* 2008 TCPA Order at 564, ¶ 9.  The FCC concluded "that the provision of a cell

phone number to a creditor, e.g., as part of a credit application, reasonably evidences prior

express consent by the cell phone subscriber to be contacted at that number regarding the debt."

*Id.*  The FCC "emphasize[d] that prior express consent is deemed to be granted only if the

wireless number was provided by the consumer to the creditor, and that such number was

provided during the transaction that resulted in the debt owed."  *Id.* at 564-65, ¶ 10.

Additionally, the FCC ruled that "a creditor on whose behalf an autodialed or prerecorded

message call is made to a wireless number bears the responsibility for any violation of the

Commission's rules.  Calls placed by a third party collector on behalf of that creditor are treated

as if the creditor itself placed the call."  *Id.* at 565, ¶ 10.  The 2008 ruling also affirmed that a

predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's

restrictions on the use of autodialers.  *Id.* at 566, ¶ 12.

Under the Administrative Orders Review Act, otherwise known as the Hobbs Act, the

Court of Appeals is vested with exclusive jurisdiction to determine the validity of all final orders

of the FCC.  28 U.S.C. § 2342(1).  This Court is therefore bound by the FCC's orders, which are

final and controlling.  *See CE Design, Ltd. v. Prism Business Media, Inc.,* 606 F.3d 443, 446 (7th

Cir. 2010) (holding that the FCC's orders relating to the TCPA are binding under the Hobbs

Act).

## DISCUSSION

## I.    Honda's and FCS's Motions to Stay

Honda and FCS have both requested the Court to stay this action pursuant to the doctrine

of primary jurisdiction so that the FCC may review and rule on certain elements at issue in this

case.  (Docs. 39, 42.)  Specifically, Honda asks the Court to stay this case while it petitions the

FCC for an interpretation on the scope of the FCC's ruling that: "a creditor on whose behalf an autodialed or prerecorded message call is made to a wireless number bears the responsibility for any violation of the Commission's rules. Calls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call." (*Id.* at 40.) Honda and FCS also both ask the Court to stay this case until the FCC rules on *In re Petition for Declaratory Ruling Regarding Non-Telemarketing Use of Predictive Dialers,* CG Docket No. 02-278, DA 12-1653, 27 F.C.C. Rcd 13031 (Oct. 16, 2012). (*Id.* at 42.) Neither issue warrants a stay of the case.

**A.** **The FCC has Unequivocally Ruled that Creditors are Liable for Calls Placed by Third-Party Debt Collectors in Violation of the TCPA**

The doctrine of primary jurisdiction requires referral of a matter to an administrative agency when the resolution of a claim turns on "issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 63-64 (1956); *see also Syntek Semiconductor Co. v. Microchip Tech., Inc.,* 307 F.3d 775, 780 (9th Cir. 2002) (describing the primary jurisdiction doctrine as "a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decisionmaking responsibility should be performed by the relevant agency rather than the courts."). However, "[t]he doctrine should be invoked sparingly since it often results in added expense and delay to the litigants." *United States v. DISH Network, LLC,* No. 09-3073, 2011 WL 475067, at *2 (C.D. Ill. Feb. 3, 2011) (citing *United States v. McDonnell Douglas Corp.,* 751 F.2d 220, 224 (8th Cir. 1984); *Mississippi Power & Light Co. v. United Gas Pipeline Co.,* 532 F.2d 412, 418-19 (5th Cir. 1976)). The Seventh Circuit has not defined specific criteria for how courts should apply the primary jurisdiction doctrine; however, it approved of the Second Circuit's decision to focus on whether a case raises issues "extending beyond the conventional

6

experience of judges or falling within the realm of administrative discretion to an administrative agency with more specialized experience." *Arsberry v. Illinois,* 244 F.3d 558, 563 (7th Cir. 2001) (internal quotation marks omitted) (quoting *National Communications Ass'n, Inc. v. AT&T Co.,* 46 F.3d 220, 222-23 (2d Cir. 1995)).

In determining whether invocation is appropriate, courts often consider several factors including: (1) whether the issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent ruling; and (4) whether a prior application to the agency has been made. *See, e.g., DISH Network, LLC,* 2011 WL 475067, at *2 (citing *Davel Communications, Inc. v. Qwest Corp.,* 460 F.3d 1075, 1086-87 (9th Cir. 2006); *Nat'l Communications Ass'n, Inc.,* 46 F.3d at 222); *Frydman v. Portfolio Recovery Associates,* No. 11 C 524, 2011 WL 2560221, at *2 (N.D. Ill. June 28, 2011) (Dow, J.).

Moreover, "the doctrine is not designed to 'secure expert advice' from agencies 'every time a court is presented with an issue conceivably within the agency's ambit.'" *Clark v. Time Warner Cable,* 523 F.3d 1110, 1114 (9th Cir. 2008) (quoting *Brown v. MCI Worldcom Network Servs.,* 277 F.3d 1166 (9th Cir. 2002)). Rather, the doctrine should only be invoked "if a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency, and if protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *Id.* (internal citations and quotations omitted).

Honda argues that the Court should invoke the doctrine of primary jurisdiction and stay the case because the FCC's guidance regarding the application of vicarious liability in the debt

collector context is purportedly scant. Specifically, Honda would like to stay this case so that it can petition the FCC for an interpretation of what the phrase "on behalf of" means as that phrase is used in paragraph 10 of the 2008 TCPA Order. That paragraph states in relevant part that "a creditor on whose behalf an autodialed or prerecorded message call is made to a wireless number bears the responsibility for any violation of the Commission's rules. Calls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call." According to Honda, the phrase "on behalf of" is ambiguous and Honda may be relieved from liability in this case depending on how the FCC interprets the phrase. The Court disagrees.

While the FCC's guidance on vicarious liability is concededly scant, it has been unequivocal that an entity can be held liable for calls made on its behalf even if the entity itself did not directly place the call. *See* 2008 TCPA Order at ¶ 10 ("calls placed by a third party collector on behalf of [a] creditor are treated as if the creditor itself placed the call"). Additionally, in a separate but related section of its promulgated rules, the FCC has been unequivocal that "[c]alls placed by an agent of telemarketer are treated as if the telemarketer itself placed the call." *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* Memorandum Opinion and Order, 100 FCC Rcd 12391, 12397 ¶ 13 (1995). Interpreting these rules does not extend beyond the conventional experience of judges or require the specialized knowledge of the FCC.

Honda's argument that they do rests on the analysis provided in two recent decisions in which the courts granted stays under the primary jurisdiction doctrine so that the FCC may consider the question of what the phrase "on behalf of" means as that phrase is used in 47 C.F.R. §64.1200(d)(3), a separate but related FCC Rule that regulates telemarketing. *See Charvat v. Echostar Satellite, LLC,* 630 F.3d 459, 466-67 (6th Cir. 2010); *Dish Network,* 2011 WL 475067,

at *2-3.  This FCC regulation holds an entity liable for telemarketing calls, as opposed to debt collecting calls, placed to wireless numbers by third parties "on behalf of" the entity.[2]

In *Charvat,* the Sixth Circuit invoked the doctrine of primary jurisdiction based on "the question of whether the [TCPA] and its accompanying regulations permit Charvat to recover damages from EchoStar, an entity that did not place any illegal calls to him but whose independent contractors did."  630 F.3d at 465.  The Sixth Circuit found that the answer to this question turned on the meaning of a number of provisions.  One of which was whether the language in §227(c) that allows a person who receives more than one call "by or on behalf of the same entity" to sue for a violation of the TCPA "create[s] liability for entities on whose behalf calls are made even when the calls are placed by independent contractors rather than by agents or employees."  *Id.*  As a result, the Sixth Circuit decided that it should invoke the primary jurisdiction doctrine so that the question could be referred to the FCC for a decision.  The same issues presented in *Charvat* were at issue in *Dish Network.*  Accordingly, the court in *Dish Network* followed the analysis in *Charvat*, held the doctrine the primary jurisdiction applied and stayed the case.  *See Dish Network,* 2011 WL 475067, at *2-3.

While *Charvat* and *Dish Network* appear to provide persuasive reasoning to stay this case, a closer examination reveals a number of differences between those cases and this one that militate against a stay.  First, the meaning of "on behalf of" in the 2008 TCPA Order is much clearer than it is in  47 C.F.R. §64.1200(d)(3).  As a preliminary matter the Court notes that the use of the phrase "on behalf of" has come to have two meanings as it is applied in the American

---

[2] 47 C.F.R. §64.1200(d)(3) states in relevant part: "If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made."

version of the English language. Traditionally, "on behalf of" meant "as the agent or representative of" while "in behalf of" meant "in the interest or for the benefit of." Bryan A. Garner, *Garner's Modern American Usage,* 91-92, Oxford Press (2d ed. 2003). However, the distinction is rarely observed in the current usage of the language. *Id.*; *see also* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY, 103 (10th ed. 1993). [3]

In the context of the 2008 TCPA Order, it is clear that the FCC intended that any calls placed for the benefit of a creditor by a third party debt collector should be treated as if the creditor placed the call itself. The relevant portion of the 2008 TCPA Order states that:

> Calls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call

2008 TCPA Order at ¶ 10. The concern in *Charvat* that liability may be limited to those situations where a call is placed on behalf of an entity by an employee is clearly precluded here by the use of the term "third party collector." This term indicates that a creditor should be liable for calls violative of the statute made by the debt collectors they hired to collect debts allegedly owed to them regardless of whether traditional agency law would deem the debt collector an agent or independent contractor of the creditor. *See, e.g., Soppet v. Enhanced Recovery Co., LLC,* 679 F.3d 637, 642 (7th Cir. 2012) (noting that as between a debt collector and a creditor, "[i]ndemnity may be automatic under ¶ 10 of the 2008 TCPA Order [because it] states that calls placed by a third-party collector on behalf of a creditor are treated as having been made by the creditor itself"); *Martin v. Cellco Partnership,* No. 12 C 5147, 2012 WL 5048854, at *2 (N.D.

---

[3] In current British use of the English language the distinction is not observed at all. "On behalf of" has replaced "in behalf of." *See* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY, 103 (10th ed. 1993).

Ill. Oct. 18, 2012) ("[T]he 2008 TCPA Order appears to impose a strict liability standard on creditors who farm their debts out to third-party debt collectors.").

Conversely, 47 C.F.R. 64.1200(d)(3) does not explain the relationship between the calling party and the potentially liable separate person or entity in the same explicit detail as the 2008 TCPA Order. The relevant portion of 47 CFR 64.1200(d)(3) states that:

> (3) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made.

The scope of the "on behalf of" language in this section is unclear (or at least not as clear as it is in the 2008 TCPA Order). As a result, the appropriate course was to invoke the doctrine of primary jurisdiction so that the parties could refer the question to the FCC for resolution. However, since 'on behalf of' in the 2008 TCPA Order, which is applicable here, clearly means "for the benefit of," there is no reason to invoke the doctrine or stay the case because Honda is clearly liable for unconsented calls placed to wireless numbers by FCS that were made to collect a debt allegedly owed Honda. *See Soppet,* 679 F.3d at 642; *Martin*, 2012 WL 5048854, at *2.

Moreover, even if the Court found that the use of the term "on behalf of" in the 2008 TCPA Order is ambiguous, a stay is not warranted because Honda failed to articulate a reasonable basis for why a referral to the FCC would affect its potential liability under the facts of this case. If the Court were to construe the FCC's rulings in the narrowest possible terms, it is clear that the FCC regulations hold a principal liable for calls placed by its agent. Therefore, Honda would be liable for calls FCS made in violation of the statute provided that FCS was acting as Honda's agent. The only argument that Honda makes to suggest that FCS did not serve

as its agent in pursuing the collection of debts purportedly owed Honda is its conclusory assertion that FCS is an independent contractor.

The federal common law of agency is in accord with the Restatement *See Opp v. Wheaton Van Lines, Inc.,* 231 F.3d 1060, 1064 (7th Cir. 2000); *Moriarty v. Glueckert Funeral Home, Ltd.,* 155 F.3d 859, 865-66 n. 15 (7th Cir. 1998). The Restatement holds that parties' labels do not control. Restatement (Third) of Agency § 1.02. Generally, an agency relationship arises when "one person (a 'principal') manifests assent to another person (an "agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency §1.01. The Restatement also holds that an agency relationship is created when the principal ratifies the act of a putative agent. Restatement (Third) of Agency §4.01. Specifically, by ratifying an act, a principal triggers the legal consequences that would follow had the act been that of agent acting with actual authority. *Id.* A principal ratifies the act of entering into a transaction when it knowingly accepts the benefits of the transaction. *Id.* at cmt. d.; *see also Rosenthal Collins Group, LLC v. Trading Technologies International, Inc.,* No. 05 C 4088, 2011 WL 722467, at *13 (N.D. Ill. Feb. 23, 2011) (internal citations omitted). In this case Honda does not dispute, and thus concedes, that it received the benefit of the calls placed by FCS as it received the money (or a percentage thereof) obtained in connection with these calls. As a result, it seems unlikely that Honda would be able to escape liability by arguing that FCS was not its agent.

Indeed, Honda does not directly address the question of whether FCS was its agent. Rather, Honda attempts to muddy the waters by arguing that the source of the agency law used to determine whether FCS acted as Honda's agent is unclear and that it should be resolved by the FCC. However, this Court sees no basis for why principles of federal agency law would not

apply.[4]  The only potential outstanding question for the FCC is whether the scope of this law may be expanded by resorting to state law or other sources.  Since FCS appears to have acted as Honda's agent under principles of federal agency law, Honda has failed to present any evidence demonstrating that a stay and the invocation of the primary jurisdiction doctrine on this ground would materially affect this case.

Denial of the motion is also appropriate in light of the prejudice Jamison would endure if a stay is granted.  *See Nat'l Commons. Assn'n,* 46 F.3d at 223 ("The court must also balance the advantages of applying the doctrine [of primary jurisdiction] against the potential costs resulting from complications and delay in the administrative proceedings.") (citing *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289 (1973)).  Honda has not yet actually filed any petition with the FCC.  If the stay were granted, Honda would have to file the petition, the FCC would have to accept public comments and then make a determination.  The amount of time this process will take is inestimable; however, *Charvat* and *Dish Network* provide an illustrative example.  There, the parties filed their petitions with the FCC on March 2, 2011 and February 22, 2011 respectively.  *See Consumer and Governmental Affairs Bureau Seeks Comment On: The Joint Petition Filed Dish Network LLC, et al. for Declaratory Ruling Concerning the Telephone Consumer Protection Act (TCPA) Rules,* CG Docket No. 11-50, 26 F.C.C. Rcd 5040, 5041 (April 4, 2011).  The FCC issued a notice on April 4, 2011 requesting comments.  *Id.*  Comments were supposed to be submitted by May 19, 2011.  *Id.* at 5043.  Today, over two years since the filing of the petitions with the FCC, no ruling or guidance has been provided.  It would be safe to

---

[4] Honda also takes issue with Jamison's reliance on Illinois agency law.  However, this issue is largely irrelevant as "the federal common law of agency is similar to Illinois agency  law, and both accord with the Restatement of Agency."  *ABN AMRO, Inc. v. Capital International, Ltd.,* 595 F. Supp. 2d 805, 821 (N.D. Ill. 2008) (citing *Opp v. Wheaton Van Lines, Inc.,* 231 F.3d 1060, 1064 (7th Cir. 2000)).

assume that the parties would face a similar timeframe here. During this entire time, Jamison will await his day in court. The Court finds that the potential delay in this case more than outweighs any theoretical benefit that might be achieved with an FCC resolution on this issue. *See Nat'l Communs. Ass'n,* 46 F.3d at 225 (holding that a delay of even two years resulting from a referral to the FCC "more than outweighs any benefit that might be achieved by having the FCC resolve" the dispute.). Accordingly, Honda's motion for a stay on this ground is denied.

### B. The FCC's Potential Reconsideration of Its Rule that Predictive Dialers Qualify as Automatic Telephone Dialing Equipment Does Not Warrant a Stay

Honda and FCS have both requested a stay of this matter under the doctrine of primary jurisdiction while the FCC considers the question of whether a predictive dialer qualifies as automatic telephone dialing equipment in *In re Petition for Declaratory Ruling Regarding Non-Telemarketing Use of Predictive Dialers*. However, a stay is not warranted on this ground because the FCC has already ruled that a predictive dialer constitutes automatic telephone dialing equipment three times. *See 2003 TCPA Order,* 18 FCC Rcd at 14091, ¶ 131; *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 19 FCC Rcd 19215, 19215, n.1 (2004) ("2004 TCPA Order"); *2008 TCPA Order,* 23 FCC Rcd 559, 566, ¶ 12.

As described above, the doctrine of primary jurisdiction should only be invoked "if a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency, and if protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." *Clark,* 523 F.3d at 1110 (internal citations and quotations omitted). This is clearly not an issue of first impression. Indeed, this is why numerous courts have rejected similar motions to stay

14

based on the primary jurisdiction doctrine. *See, e.g., Frydman,* 2011 WL 2560221, at *5 (denying motion for stay that requested stay on primary jurisdiction grounds so FCC may decide whether debt collectors are exempt from FCC and whether predictive dialers are automated dialing systems within the meaning of the term in the TCPA); *Tovar v. Midland Credit Management,* No. 10 C 2600, 2011 WL 1431988, at *4 (S.D. Cal. Apr. 13, 2011) (rejecting motion to stay, in part, because FCC has already addressed that "predictive dialers used by debt collectors fall within the meaning of autodialers"); *Robinson v. Midland Funding, LLC,* No. 10 C 2261, 2011 WL 1434919 (S.D. Cal. Apr. 13, 2011) (same).

Moreover, the fact the FCC issued a public notice requesting comments on a petition that could potentially result in a change in the FCC's position is simply not enough of a reason for this Court to stay this action. As described above, courts often weigh the benefits of applying the doctrine against the potential litigation costs resulting from complications and delay. *See Nat'l Communs. Assn'n,* 46 F.3d at 223; *see also Roberts v. Chemlawn Corp.,* 716 F. Supp. 364, 365 (N.D. Ill. 1989); *Frydman,* 2011 WL 2560221, at *7. A stay will not serve judicial economy here. The defendants have not offered any evidence or argument to suggest that if the FCC were to change its position that change would apply retroactively to the pending litigation. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988) (holding that agency regulations cannot be applied retroactively unless Congress has so authorized the administrative agency and the language of the regulations require it); *Beller v. Health & Hosp. Corp.,* 703 F.3d 388, 391 (7th Cir. 2012). As a result, a change in the FCC's rules would likely not affect Jamison's claims. *See, e.g., Frydman,* 2011 WL 2560221, at *7 (declining to refer case to FCC under doctrine of

primary jurisdiction because any ruling would likely only be made on a prospective basis).[5]  As described above, the substantial delay resulting from a stay and corresponding impact to the Plaintiff will outweigh any potential benefits of waiting for the FCC to rule on this issue again. Accordingly, the motions to stay are denied.

## II.      The Motion for Class Certification

The decision to certify a class action rests within the discretion of the district court.  *See Mira v. Nuclear Measurements Corp.,* 107 F.3d 466, 471 (7th Cir. 1997).  "[T]he party seeking class certification assumes the burden of demonstrating that certification is appropriate."  *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7th Cir. 1993).  Whether a plaintiff has met his burden is measured by the "preponderance of the evidence" standard.  *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012).

A party may pursue its claim on behalf of a class only if it can establish that the four threshold requirements of Federal Rule of Civil Procedure 23 are met: (1) the class is so numerous that joinder of all members is impracticable [numerosity]; (2) there are questions of law or fact common the class [commonality]; (3) the claims or defenses of the representative

---

[5] The Court is aware that petitioners in the FCC matter asked the FCC to "clarify that predictive dialers that are not used for telemarketing purposes...are not 'automatic telephone dialing systems.'"  *Petition for Dec. Rul.,* 27 F.C.C. Recd. at 13031.  Generally, a statutory or regulatory "clarification" does not raise issues regarding retroactivity.  *See Clay v. Johnson,* 264 F.3d 744, 749 (7th Cir. 2001) (stating that a clarifying rule "can be applied to the case at hand just as a judicial determination construing a statute can be applied to the case at hand," and does not raise issues of retroactivity).  However, despite how it is styled, the Court fails to see how the petition requests anything less than for the FCC to overturn the clear language of the 2008 TCPA Order.  The 2008 TCPA Order specifically ruled that debt collectors may not use predictive dialers to call cellphones unless the wireless phone number was provided by the subscriber in connection with the existing debt.  *See 2008 TCPA Order* at 567, ¶ 14.  Therefore, the FCC petitioners have not really asked for a clarification but for a change in the existing regulations.  A change in an agency's existing regulations is presumed to not be retroactive.  *See Bowen,* 488 U.S. at 208.

parties are typical of the claims or defenses of the class [typicality]; and (4) the representative parties will fairly and adequately protect the interests of the class [adequacy]. Fed R. Civ. P. 23(a).

If the moving party meets this initial burden, it must also show that the requirements of Rule 23(b)(3) are met. *See Oshana v. Coca-Cola Co.,* 472 F.3d 506, 513 (7th Cir. 2006). This means that Jamison must show that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members [predominance], and that a class action is superior to other available methods for fair and efficient adjudication of the controversy [superiority]." Fed. R. Civ. P. 23(b)(3). In addition to the Rule 23 requirements, the party seeking class certification must provide a workable class definition by showing that the members of the class are identifiable. *See Oshana,* 472 F.3d at 513.

In this case the Defendants have raised eight separate arguments for why the class should not be certified. While the Court finds that certain of these arguments are correct and warrant denial of class certification, the Court disapproves of the Defendants' shotgun approach to objecting to class certification. The Seventh Circuit has advised appellants that presenting too many issues is "the equivalent of a laser light show of claims [which] may be so distracting as to disturb our vision and confound our analysis." *United States v. Lathrop,* 634 F.3d 931, 936 (7th Cir. 2011); *see also Howard v. Gramley,* 225 F.3d 784, 791 (7th Cir. 2000) (discussing the deficiencies in the "kitchensink" approach to appellate litigation); *Gagan v. Am. Cablevision, Inc.,* 77 F.3d 951, 955 (7th Cir. 1996) (advising appellants to use a rifle approach to briefing rather than bringing "their shotgun to Chicago"). This advice is equally applicable to briefs filed in opposition to a motion for class certification. By objecting to class certification on so many grounds, the Defendants raise a number of weak arguments that will be rejected but that also

detract from their stronger arguments. The Court encourages the parties to follow the advice of the Seventh Circuit and limit their future briefs in this area to their three or four strongest arguments. Nevertheless, the Court proceeds and considers the arguments set forth by the parties on whether class certification is warranted in this case.

### A.     The Proposed Class

Jamison seeks to certify a class comprised of those who received unsolicited telephone calls to their wireless numbers from the Defendants made to their cellphones. Perhaps realizing that there are certain deficiencies in the definition of the class he proposed in his complaint, Jamison offers an alternative class definition in his reply in support of his memorandum for class certification. The class defined in the complaint consists of:

> (1) all persons in the United States (2) to whose cellular telephone number (3) FCS or American Honda placed a non-emergency telephone call (4) using an automatic telephone dialing system or an artificial or prerecorded voice (5) within 4 years of the complaint (6) with respect to a debt allegedly owed to American Honda (7) where FCS or American Honda obtained the cellular telephone that was called via skip trace methods.

(Doc. 1 at ¶ 32.)

In his reply in support of his memorandum for class certification, Jamison proposed the following alternative class definition:

> (1) all persons in the United States (2) to whose cellular telephone number (3) FCS or American Honda placed a non-emergency telephone call (4) using an automatic telephone dialing system or an artificial or prerecorded voice (5) within 4 years of the complaint (6) with respect to a debt allegedly owed to American Honda (7) where FCS or American Honda obtained the cellular telephone that was called via skip trace methods and (8) that cellular telephone number does not appear in Honda's business records.

(Doc. 91 at 24.)

The Seventh Circuit has not addressed the scope of the Court's discretion to modify a class definition at the certification stage. District courts appear to be split on whether to hold a plaintiff to the class defined in the complaint. *Compare, e.g., Heastie v. Community Bank of Greater Peoria,* 125 F.R.D. 669, 672 n. 3, 680 n. 10 (N.D. Ill. 1989) ("As the Court observed earlier, the class definition proposed in [plaintiff's] motion for class certification differs from that set forth in her complaint. The Court has certified the class as originally proposed, but [plaintiff] may file an appropriate motion to amend both her complaint and the class definitions we have set forth here..."); *Clarke v. Baptist Mem'l Healthcare Corp.,* 264 F.R.D. 375, 381 (W.D. Tenn. 2009) ("To accommodate a new proposed class definition, plaintiffs will need to amend the complaint."); *Costelo v. Chertoff,* 258 F.R.D. 600, 604-05 (C.D. Cal. 2009) ("The Court is bound to class definitions provided and, absent an amended complaint, will not consider certification beyond it."), *with Savanna Group, Inc. v. Trynex, Inc.,* No. 10 C 7995, 2013 WL 66181, at *2-3 (N.D. Ill. Jan. 4, 2013) (allowing amendment during certification proceedings and noting "[t]hat this approach is also consistent with Rule 23, which contemplated the amendment of a class certification order prior to judgment"); *Bridgeview Health Care Ctr. Ltd. v. Clark,* 09 C 5601, 2011 WL 4628744, at *2 (N.D. Ill. Sept. 30, 2011) (allowing amendment during certification proceedings). The Court, however, does not need to decide whether the amendment is appropriate because Jamison fails to meet the standards of Rule 23 under either definition.

**B.      Jamison Satisfies the Numerosity Requirement**

Federal Rule of Civil Procedure 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity is generally satisfied by identifying a class containing at least 40 members. *See, e.g., McCabe v. Crawford & Co.,* 210 F.R.D. 631, 643-44 (N.D. Ill. 2002); *cf Pruitt v. City of Chicago,* 472 F.3d 925, 926 (7th

Cir. 2006). Jamison has identified 2,887 telephone numbers that FCS used its dialing system to call that were obtained by skip trace methods and which are currently registered as a cellphone number. The defendants do not dispute, and thus concede, that it would be impracticable to join this many potential plaintiffs in the present action. Accordingly, Jamison has met his burden on numerosity.

### C. Jamison Establishes Commonality and Typicality

Federal Rule of Civil Procedure 23(a)(2) requires that "questions of law or fact common to the class" exist. *Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir. 1998) (quoting *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir. 1992)). "A common nucleus of operative fact is usually enough to satisfy" this requirement. *Id.* Typicality is closely related to commonality. *See id.* at 594. It requires "that the claims or defenses of the representative party be typical of the claims or defenses of the class." *Muro v. Target Corp.,* 589 F.3d 485, 492 (7th Cir. 2009) (quoting *Williams v. Chartwell Fin. Servs., Ltd.,* 204 F.3d 748, 760 (7th Cir. 2000)). This means the claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and...[the] claims are based on the same legal theory." *Oshana,* 472 F.3d at 514 (quoting *Rosario,* 963 F.2d at 1018.).

Jamison has satisfied both the commonality and typicality requirements. His claim arises from the same course of conduct that gives rise to the claims of the other class members and his claims are based on the same legal theory. Namely, FCS used an automatic telephone dialing system to call Jamison and every other class members' cellular telephone while undertaking to collect debts on behalf of Honda in violation of the TCPA. There are also four common questions for the class: (1) whether FCS' dialer functions as an automatic telephone dialing system; (2) whether FCS' dialer delivers pre-recorded messages; (3) whether the defendants'

20

conduct was knowing or willful; and (4) whether Honda is liable for FCS' telephone calls to the class members. Defendants do not dispute, and thus concede, that Jamison has met his burden to show commonality and typicality. The Court agrees and finds that Jamison has met his burden on these elements.

### D. Jamison's Felony Conviction Renders Him Inadequate to Serve as Class Representative

Jamison fails to meet his burden in establishing himself to be an adequate representative for the class. Federal Rule of Civil Procedure 23(a)(4) requires that the interests of a class be fairly and adequately protected by the class representative. The adequacy analysis has two components: (1) adequacy of Plaintiffs' counsel; and (2) adequacy of the named plaintiff to protect the interests of the entire class. *See Retired Chi. Police Ass'n,* 7 F.3d at 598; *see also Sec'y of Labor v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir. 1986). The Seventh Circuit has held that a "named plaintiff who has serious credibility problems or who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative." *CE Design Ltd. v. King Architectural Metals, Inc.,* 637 F.3d 721, 726 (7th Cir. 2011). However, "[f]or an assault on the class representative's credibility to succeed, the party mounting the assault must demonstrate that there exists admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims." *Id.* at 728 (quoting *Dubin v. Miller,* 132 F.R.D. 269, 272 (D. Colo. 1990)).

Typically where courts have denied class certification they have done so because the class representative generally lacked credibility or the class representative's credibility was severely strained with respect to the claims in the lawsuit. *See, e.g., Schleicher v. Wendt,* No. 02

21

C 1332, 2009 WL 761157, at *3 (S.D. Ind. Mar. 20, 2009) (Hamilton, J.) (class representative who was convicted of criminal fraud was unfit to serve as fiduciary for class that was asserting that they were victims of a fraudulent scheme); *Kaplan v. Pomerantz,* 132 F.R.D. 504, 510 (N.D. Ill. 1990) (Rovner, J.) (false testimony during deposition warranted decertification of the class). Indeed, numerous courts have found that "a fraud conviction undermines a proposed class representative's adequacy to represent the class." *Schleicher,* 2009 WL 761157, at *3; *see also Xianglin Shi v. Sina Corp.,* No. 05 C 2154, 2005 WL 1561438 (S.D.N.Y. July 1, 2005); *Hartsell v. Source Media,* No. 98 C 1980, 2003 WL 21245989, at *3 (N.D. Tex. Mar. 31, 2003); *In re Proxima Corp. Securities Litigation,* No. 93 C 1139, 1994 WL 374306 (S.D. Cal. May 3, 1994).

As described above, Jamison pled guilty to a felony charge to access device fraud in 2008. This is obviously a conviction for fraud, which is sufficient by itself to render Jamison an inadequate representative under the case law. This conviction is admissible and may be offered to impeach his credibility with a factfinder. *See* Fed. R. Evid. 609. [6] As a result, there is a strong likelihood that the jury will focus on Jamison's credibility and not the claims of a potential class. This risk is heightened by the facts that uniquely pertain to Jamison. Jamison is asking for approximately $16,000 in statutory damages. However, there is an open question as to whether Jamison or his mother paid the bill for the cellphone that was allegedly called. As a result,

---

[6] Defendants also argue that the engagement agreement between Jamison and his counsel renders Jamison an inadequate representative for the class. This argument is based on the fact that the engagement agreement states that Jamison will not settle the case without the consent of his attorneys thereby turning control of the case completely over to his attorneys. However, in his deposition Jamison testified that the phrase "without the consent of the attorneys" meant only that he needed to confer with his attorneys before entering into a settlement agreement. As the Court in *In re Ocean Ban* found, this a non-issue because any technical inadequacies caused by the language in the engagement agreement can easily be cured by amendment. *See* 06 C 3515, 2007 WL 1063042, at *6 (N.D. Ill. Apr. 9, 2007). If the Court were to otherwise grant the motion for certification, it would require Jamison and his counsel to amend the agreement; however, since the motion fails for other reasons, this is a non-issue.

determining whether Jamison suffered any monetary loss as a result of FCS' and Honda's alleged conduct will be an issue at trial. The recent fraud conviction combined with the question of whether Jamison pays the bill for the cellphone in question could lead the jury to focus on Jamison's credibility as opposed to the claims of absent class members. The jury could reasonably conclude that Jamison is a convicted fraudster who is seeking a windfall in litigation despite the fact that he never suffered any monetary loss. It is likely that the jury would hold this against the class even though a large percentage of the class has never committed a crime and was monetarily damaged by the defendants' conduct. Accordingly, the Court finds that Jamison has failed to establish adequacy by a preponderance of the evidence.

### E.  Jamison Fails to Satisfy the "Predominance" Requirement of Rule 23(b)(3)

In addition to failing to establish that he can serve as an adequate class representative, Jamison fails to satisfy the requirements of Federal Rule of Civil Procedure 23(b)(3). Rule 23(b)(3) requires a plaintiff to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." In applying these standards, the Court focuses on "the substantive elements of plaintiffs' cause of action and inquire into the proof necessary for the various elements." *Simer v. Rios,* 661 F.2d 655, 672 (7th Cir. 1981). Moreover, the Supreme Court has held that "the predominance criterion is far more demanding" than "Rule 23(a)'s commonality requirement." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 624 (1997).

The TCPA generally makes it unlawful to call wireless numbers using an auto-dialer without "the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A). In the debt collection context, the FCC has stated that "express consent" is given if a consumer gives a

creditor a cellphone number "during the transaction that resulted in the debt owed." 2008 TCPA Order at ¶ 10. The class definitions articulated by Jamison require either that class members' cellphone numbers were obtained by skip trace methods or that class members' cellphone numbers were obtained by skip trace methods *and* their cellphone numbers are not located in Honda's records.

Here, Honda contends that determining whether any particular class member gave Honda his or her cellphone number "during the transaction that resulted in the debt owed" would require careful review of Honda's individual records on a member-by-member basis. In other words, Honda argues that the Court would be required to engage in a class-member-specific inquiry to determine whether each recipient consented to receiving calls on their cellphone. This, according to Honda, would result in individualized questions predominating over common questions of law or fact.

There is a split of opinion in TCPA cases on whether issues of individualized consent predominate over common questions of law or fact so as to prevent class certification. *Compare, e.g., Gene & Gene L.L.C. v. BioPay, L.L.C.,* 541 F.3d 318, 326-29 (5th Cir. 2008) (holding that district court abused its discretion in certifying class because the individualized issue of whether "fax advertisements were transmitted without the prior express invitation or permission of each recipient" prevented plaintiff from "advanc[ing] any viable theory employing generalized proof concerning the lack of consent with respect to the class...[which] leads to the conclusion that myriad mini-trials cannot be avoided."); *G.M. Sign, Inc. v. Brink's Mfg. Co.,* No. 09 C 5528, 2011 WL 248511, at *8 (N.D. Ill. Jan. 25, 2011) (St. Eve, J.) (holding that individualized issues of consent predominated over common issues because defendant set forth specific evidence showing large amount of the putative class consented to receive faxes); *Versteeg v. Bennett,*

*Deloney & Noyes, P.C.,* 271 F.R.D. 668, 674 (D. Wyo. 2011) (holding that because "the TCPA claims will require extensive individual fact inquiries into whether each individual gave 'express consent' by providing their wireless number to the creditor during the transaction that resulted in the debt owed...individual inquiries [] predominate over the class action"); *Kenro, Inc. v. Fax Daily,* 962 F. Supp. 1162, 1169 (S.D. Ind. 1997) (same), *with Balbarin v. North Star,* 10 C 1846, 2011 WL 211013, at *1 (N.D. Ill. Jan. 21, 2011) (Bucklo, J.) (denying motion for reconsideration on class certification because the court "tailored the class so that it would capture those individuals whose numbers were obtained through defendant's routine use of third party information providers, but exclude individuals who provided their numbers to either defendant or the original debtor. The possibility that some putative class members might ultimately be found to be outside the class does not preclude class certification."); *G.M. Sign, Inc. v. Franklin Bank, S.S.B.,* No. 06 C 949, 2008 WL 3889950, at *6 (Aug. 20, 2008) (Kocoras, J.) (rejecting individualized inquiry into consent as a bar to certification because "[s]uch evidence would be within the knowledge of the potential class member, and a party would need a good-faith basis to believe that he or she satisfies the class definition before making a representation to this court to that effect."); *G.M. Sign, Inc. v. Finish Thompson, Inc.,* No. 07 C 5953, 2009 WL 2581324, at *6 (N.D. Ill. Aug. 20, 2009) (Kendall, J.) (The defendant "cannot defeat class certification by asserting the vague possibility that some of the individuals on the anonymous lists have perchance consented to receiving the fax.").

The rule that can be extracted from these cases is that issues of individualized consent predominate when a defendant sets forth specific evidence showing that a significant percentage of the putative class consented to receiving calls on their cellphone. However, if the defendants fail to set forth this specific evidence and instead only make vague assertions about consent, then

individualized issues regarding consent will not predominate over common questions of law or fact so as to prevent class certification.

In support of its opposition to class certification Honda provided the affidavit of Melissa Metcalf, the Manager of the National Recovery Center for American Honda Finance Corp. Metcalf stated that Honda uses a Customer Account Servicing System ("CASS") to track its customers. CASS contains a large volume of information about the particular customer relationship such as: (1) the contact information; (2) the make and model of the car; (3) the customer's payment history; (4) account notes memorializing contact with the customer, etc. She also attested that when Honda customer service representatives speak to customers, it is common for them to obtain the customer's preferred number to be contacted at and to enter that number into the appropriate "phone" field in CASS. CASS has fields for home, work and cellphone numbers. However, the customer services representatives also sometimes enter the customer's preferred contact number in the "notes" field and do not enter it in the "phone" field.

However, Honda does not provide information contained in CASS to third-party debt collectors like FCS. Rather, Honda provides FCS with the information contained in its Recovery Management System database ("RMS"). This because when a customer has not made a payment for 120 days, or if there is a balance owed after the car has been repossessed, the debt is transferred to the National Recovery Center, which uses the RMS system. CASS feeds information into the RMS system; however, this data entry is subject to certain limitations. One of those limitations is that that RMS does not include a cellphone field. Instead it only has fields for work and home numbers. As a result, Honda does not provide cellphone numbers to FCS even though a customer may have consented to be called on his or her cellphone.

FCS identified 2,887 wireless phone numbers that it called with an automatic dialing machine to collect a debt owed to Honda where it had obtained the number via skip trace methods. However, when Honda's IT personnel ran those numbers through the "phone" fields in CASS they found that over 1,200 of those numbers appeared in the CASS cellphone field. More cellphone numbers may also appear in CASS's "notes" field; however, Honda has no quick, automated way of searching the "notes" field. According to Metcalf, if Honda needed to determine whether a person had provided consent to be called on his or her cellphone, Honda would have to undertake a labor intensive review of CASS's notes field, the audit logs as well as running the search through the "phone" fields.

As a result, this case is much more similar to *Gene & Gene* and *Brink's Manufacturing* than it is to *Balbarin* or *Finish Thompson*. Honda has introduced evidence that it elicited consent to call a large percentage of the potential class members on their cellphones. Based on this the Court would have to conduct a series of mini-trials to determine the population of the class and to determine liability. Specifically, the parties would need to scour Honda's records to determine whether a potential class member's wireless number appears in the CASS cellphone field, whether it appears in the notes field or whether it appears in the audit logs. Jamison's alternative class definition does not relieve this problem. While it would eliminate the 1,200 numbers identified in the CASS cellphone field, it would still require a determination of whether each putative class member's cellphone number appears anywhere in Honda's records. Since there is no way to employ generalized proof to prove consent, or lack thereof, Jamison has failed to meet

his burden under Rule 23(b)(3) because individual issues predominate over common ones. *See, e.g., Gene & Gene,* 541 F.3d at 329; *Brinks Manufacturing,* 2011 WL 248511, at *8.[7]

### F.  The Class is Not Ascertainable

Finally, while not an explicit requirement under Rule 23, the Seventh Circuit has held that a class definition "must be definite enough that the class can be ascertained." *Oshana,* 472 F.3d at 513. "To be ascertainable, a class must be identifiable as a class and membership within it must be determined by application of precise, objective criteria." *Bridgeview Health Ctr., Ltd.,* 2011 WL 4628744, at *2; *see also Pawelczak v. Financial Recovery Services,* 286 F.R.D. 381, 385 (N.D. Ill. 2012).

As an initial matter, the Court notes that there appears to be substantial overlap between the arguments relating to predominance and ascertainability; however, the Court will address the arguments as they were framed by the parties. Thus, the Court will address the parties'

---

[7] In its response brief Honda also argued that issues relating to arbitration agreements in individual financing contracts as well as issues relating to set-off will predominate over common issues. However, in contrast to the specific evidence that it introduced regarding consent, Honda did not provide sufficient particularized evidence regarding potential class members who may be subject to arbitration. Therefore, this potential individualized defense does not predominate over common issues. *See, e.g., Herkert v. MRC Receivables Corp.,* 254 F.R.D. 344, 350 (N.D. Ill. 2008) (stating that the "possibility that some of the putative class members could have cardmember agreements with varying terms, including: 1) agreements that are subject to differing state laws; 2) agreements containing arbitration clauses; and 3) agreements containing or not containing class action waivers" does not preclude certification"); *In re Evanston Northwestern Healthcare Corp. Antitrust Litig.,* 268 F.R.D. 56, 66 (N.D. Ill. 2010) (overruled on other grounds) ("the possible arbitration of some class members claims does not destroy predominance in the case at bar."). While Honda set forth some evidence demonstrating that approximately 75% of the potential class could be subject to a set-off, Honda's potential counterclaims would not predominate over the common questions relating to liability. *See, e.g., Taylor v. Halsted Fin. Servs., LLC,* No. 99 C 2466, 2000 WL 33201925, at *13 (N.D. Ill. Jan. 14, 2000) ("[T]he specter of potential counterclaims or set offs are not a bar to certification."); *Wells v. McDonough,* No. 97 C 3288, 1998 WL 160876, at *6 (N.D. Ill. Mar. 31, 1998) (common issues predominate regardless of potential individual issues relating to set off because set off does not relate to liability).

arguments relating to class definition in this section although they could just have easily been presented as additional potential examples of why individual issues predominate over common ones.

The class defined in Jamison's Complaint is not sufficiently definite to warrant certification. Membership in that proposed class only requires FCS or American Honda to have called a potential class member's wireless phone number and to have obtained that number via skip trace methods. As was discussed more thoroughly above in the section on predominance, such a class could include thousands of individuals who consented to receiving calls on their cellphones and thus have no grievance under the TCPA. These people likely gave their wireless number to Honda as their preferred contact number when they filled out their credit application; however, that number did not get transferred from Honda to FCS because of the limitations in the RMS. Therefore, this proposed class is overbroad. *See Oshana,* 472 F.3d at 513-14 (affirming denial of class certification on ascertainability grounds as proposed class was overbroad because it contained millions of potential members who were not actually deceived into purchasing Diet Coke and thus did not have an ICFA claim); *Vigus v. Southern Illinois Riverboat/Casino Cruises, Inc.,* 274 F.R.D. 229 (S.D. Ill. 2011) (denying certification of TCPA claims on ascertainability grounds and stating that "[w]here a class is overbroad and could include a substantial number of people who have no claim under the theory advanced by the named plaintiff, the class is not sufficiently definite."); *Pesce v. First Credit Services,* No. 11 C 1379 at Doc. 126 (Gettleman, J.) (decertifying class in precursor case as too broad because potential class members included people where "the original creditors' records show that the person provided the cell phone number to the creditor but defendant's records do not.").

Jamison, likely realizing this deficiency, proposed an alternative class definition in his reply brief. This definition specifically excludes all individuals whose wireless numbers are located in Honda's business records. Honda and FCS still contend that the class cannot be ascertained because there is no practicable way to determine whether called numbers were cellphone numbers at the time of the call. They also contend that the actual "called party" at the time the call was made cannot be determined.

The Defendants' first argument rests on the hypothesis that some of the telephone numbers that FCS called were actually residential telephone numbers at the time of the call but were then subsequently ported to cellular telephone service. Therefore, according to the Defendants, the class cannot be ascertained because there is no practicable way to determine whether the calls were actually placed to cellphones. The Court finds this argument unpersuasive. First, after referring to the CNAM database maintained by mobile service providers FCS conceded in response to an interrogatory that 2,431 of the 2,887 numbers at issue were never issued to a residence or other landline. These numbers have always been assigned as wireless numbers. Second, there is no evidence, beyond the defendants' speculation, that any of the remaining 456 numbers were ever ported from a landline to a cellphone. However, Jamison can confirm that these numbers were not ported by issuing subpoenas to the top nine wireless carriers (which cover 98% of the market) to identify whether the numbers were assigned to their cellular service at the time the calls were made. "It is not fatal for a class definition to require some inquiry into individual records, as long as the inquiry is not so daunting as to make the class definition insufficient." *Heckert,* 254 F.R.D. at 348. The Court does not find this potential inquiry so daunting as to make the class definition insufficient.

However, defendants' second point raises a valid objection to Jamison's proposed class definition. In his reply brief, Jamison argues that the term "called party" refers to the regular user of the cellphone. He also argues that the identities of the regular users the cellphone numbers at issue could be identified through a search of the Defendants' records or through the use of a public record database such as Accurint. However, this ignores what is required by the Seventh Circuit in *Soppet v. Enhanced Recovery Company*. For purposes of the TCPA a subscriber is not just the regular user of the cellphone; rather, a subscriber is the person subscribing[8] to the called number at the time the call is placed. *See Soppet,* 679 F.3d at 643. A search of defendants' records may identify who the defendants intended to call. However, as Jamison and *Soppet* demonstrate, debt collectors do not always call who they intend to call.[9] An Accurint search may identify the current regular user of a cellphone number. However, Jamison's proposed class covers four years-worth of alleged telephone calls. The current subscribers of the cellphone numbers that were called over that period are likely not to be the same people as who were the subscribers when the calls were made.

As a result Jamison's solutions are insufficient to identify the regular user of a particular wireless number at the specific point in time FCS placed calls that were violative of the TCPA. This identification is necessary under the Seventh Circuit's holding in *Soppet* because only the person subscribing to the called number at the time the call was made would have a viable TCPA claim. *See id.* (holding that "called party in § 227(b)(1) means the person subscribing to the

---

[8] In *Soppet,* the Seventh Circuit defined the term "subscriber" to mean "the person who pays the bills or needs the line in order to receive other calls." *Soppet,* 679 F. 3d at 640.

[9] Jamison and the Defendants agree that FCS intended to call Jamison's sister and not Jamison. *Soppet* involved a suit brought by two cellphone subscribers who were called repeatedly by debt collectors seeking to collect a debt from the previous subscriber of those cell phone numbers. *See Soppet,* 679 F.3d at 638-39.

called number at the time the call is made" and not the intended recipient of the call.); *see also Vigus,* 274 F.R.D. at 236 (stating that to identify a class under the TCPA, "it would be necessary to identify the people assigned to those numbers at the times the allegedly offending calls were made, which may not be the people currently assigned to those numbers). Jamison has not proposed any method by which this can be accomplished. Therefore, Jamison has failed to establish by clear and convincing evidence that the class is ascertainable.

## **CONCLUSION**

For the reasons set forth above Honda's and FCS's motions for stay are denied. Jamison's motion for class certification is denied. Honda's motion for leave to file a surreply in support of its opposition to the motion for class certification is also denied.[10]

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 28, 2013

---

[10] On March 12, 2013, Honda filed a motion for leave to file a surreply in support of its opposition to the motion for class certification. The basis for the motion was that Jamison raised new issues in his reply brief in support of his motion for class certification. At a hearing on March 18, 2013, the Court stated it would take the motion for leave under advisement and determine whether a surreply is appropriate after reviewing the initial briefs. The decision whether to grant a motion for leave to file a surreply is within the discretion of the district court. *See Johnny Blastoff, Inc. v. L.A. Rams,* 188 F.3d 427, 439 (7th Cir. 1999). However, denial of a motion for leave is appropriate when the moving party has already had the opportunity to fully brief the issues. *See, e.g., Almy v. Kickert School Bus Line,* No. 8 C 2902, 2013 WL 80367, at *15 (N.D. Ill. Jan. 7, 2013); *Destiny Health, Inc. v. Conn. Gen. Life Ins. Co.,* 741 F. Supp. 2d 901, 911 (N.D. Ill 2010). After reviewing the initial briefs, the Court finds that Honda has had the opportunity to fully brief the issues. Accordingly, a surreply is not appropriate here.